ALBERT C. CORNISH, APPELLANT, v. WILLLAM P. JENKS, IMPLEADED, ETC., INDIVIDUALLY AND AS ONE OF THE PARTNERS TRADING UNDER THE NAME OF JENKS, GWYNNE & COMPANY, RESPONDENT.

Submitted October term, 1931—Decided May 16, 1932.

For the appellant, *Lum, Tamblyn & Colyer* (*Ralph E. Lum* and *Tracy S. Voorhees,* of counsel).

For the respondent, *Pitney, Hardin & Skinner* (*Shelton Pitney,* of counsel).

The opinion of the court was delivered by

CASE, J. This is an appeal by the plaintiff from a judgment of no cause of action entered on a jury verdict in the Morris Circuit. The action was in conversion with respect to the management of plaintiff's account by defendant's firm of stock brokers.

Appellant's points one, two, four and five need not be considered for the reason that the grounds of appeal upon which they are based do not apprise the court with precision of the errors complained of. A ground of appeal that challenges the propriety of a portion of the charge to the jury should reproduce the language objected to. *Hintz* v. *Roberts,* 98 *N. J. L.* 768; *O'Brien* v. *Staiger,* 101 *Id.* 526; *State* v. *Blaine,* 104 *Id.* 325. Grounds of appeal relating to refused requests to charge should embody the actual language of the requests and mere references to them by numbers are irregular and insufficient. *Stathos* v. *Bunevich,* 107 *Id.* 269. The court is entitled to know precisely the specific ruling to be dealt with, and opposing counsel what he is expected to meet.

*Shedaker* v. *James,* 107 *Id.* 400. For the consideration of the remaining points knowledge of some of the facts is necessary.

The plaintiff was, over a period of many years, in the employ of the Standard Oil Company in China. He made periodical visits to this country on furlough. One such was in the winter of 1922 to 1923; another such was in 1926. In 1922 Cornish opened a margin account with Jenks, Gwynne & Company. On February 9th, 1923, Cornish wrote Jenks, Gwynne & Company a letter the pertinent part of which is as follows:

"Dear Sirs: * * * During my absence in China, I am hereby authorizing Mr. Clinton Burns, in an emergency, to take such action in connection with the stocks and bonds held by you for my account as he may think best; *i. e.,* as to their disposal and/or replacement."

On March 5th, 1923, Cornish executed a marginal account instrument to Jenks, Gwynne & Company containing this clause:

"My orders are given with the understanding that commitments carried for me will be properly protected, and should I fail to deposit margin with you when demand has been made, I authorize the sale of any and all securities carried for my account and the closing of any and all open contracts for my account, either at public or private sale or upon any exchange, and notice of any such sale or closing and of the time and place thereof is waived."

Numerous stock transactions on this basis ensued. After Cornish had been in New York a few months in 1926, he returned to China and learned from a fellow-employe of the Standard Oil Company that Clinton Burns, the person mentioned in the letter of February 9th, 1923, and a former employe of the same company, was engaging in large and profitable stock transactions for himself and others in New York City and making his headquarters at the office of Jenks, Gwynne & Company. On March 15th, 1927, Cornish cabled Burns a code message interpreted as follows:

"Request you to buy and/or sell my acct. J. G. & Co. sound

stocks your discretion not less than 40% margin similar account Hanscomb. Cornish."

That cable was received by Burns, made known to defendant's firm and acted upon. Cornish also wrote defendant's company on March 15th, 1927, as follows:

"Dear Sirs: Please accept this as authority allowing Mr. Clinton Burns to instruct you from time to time in buying and selling securities for my account with you, limiting my total average margin to 40%."

These instructions were followed by increased activity in Cornish's account under Burns' direction, as a result of which Cornish's original investment was pyramided into large paper profits. It does not appear that there was any brokerage operation conducted on a basis of less than forty per cent. margin until about the 19th of October, 1929, when, over a period of a couple of days, there were transactions by way of purchase and sale conducted on Burns' authority that caused the account on the check-up at the close of the day's transactions, to drop a point or two in margin security below forty per cent. On October 29th, 1929, the market suffered a crash. Prices dropped precipitately. Margin accounts were threatened with extinction. After office hours on that day the members of the defendant's firm, in reviewing their accounts and communicating with their customers, telephoned Burns and, while there is conflict between Burns and the other witnesses as to what was said, there was evidence to sustain a finding, and clearly by inference there was a finding, by the jury that Burns directed the brokerage house to sell out all of his lines of stock, his own and his customers'. Acting thereon, defendant's firm did, on the following day, make large sales of plaintiff's stocks not closing them out entirely but leaving an equity of about seven thousand dollars.

On March 28th, 1930, Cornish issued summons and complaint and in the complaint set forth two counts, both grounding in conversion. The first count charged conversion in that defendant's firm had received Burns' instructions and made stock market transactions in October, 1929, leaving the margin less than forty per cent., thereby hypothecating plain-

tiff's securities to secure unauthorized purchases. The second count charges that on October 30th, 1929, defendant's firm sold plaintiff's securities without notice to him and without authority, thus violating their legal duty by way of giving. notice and thereby hypothecating plaintiff's securities to their own financial needs.

Appellant's third point is that the instructions in the letter of February 9th, 1923, from Cornish to Jenks, Gwynne & Company, admitted in evidence as *"Exhibit D 1,"* were canceled by the return of the plaintiff to this country in 1926 and if not by this return then by the later instructions of March 15th, 1927; and that admission of the letter as an exhibit was error. The letter was an incident in the transactions between the plaintiff and his brokers. It was never specifically recalled or canceled. It was clearly intended to be operative at the time it was written. That it was intended to endure beyond the formal marginal agreement of March 5th, 1923, is apparent from the contention, mentioned above, as to the time of its termination. The logic of the situation is quite in favor of subsisting strength. We think of no reason why Cornish should want Burns to have complete power in an emergency during the period that Cornish was directing his own purchases and sales and yet not want Burns to have that authority when the latter was conducting the usual and current market operations. Cornish was in the antipodes and his fortune was in Wall street, subject to emergent conditions that he apprehended and prepared for. He wanted someone, with authority, on the spot. A very sane desire, surely, and one which, in its fulfillment, may have saved to him the few thousands of dollars that were left. Appellant's contention resolves itself into the proposition that Burns' authority as agent, either to buy or to sell, ended the instant the marginal equity in Cornish's favor, based on the relation of the market value of the securities to the debt owing the brokers, fell below forty per cent. This is subject to the seeming *reductio ad absurdum* that in calm seas plaintiff wanted a pilot, but in the stress of storm he did not; while things were moving smoothly plaintiff desired

an experienced agent, but when the fluctuations of prices should automatically reduce his equity below the safe margin of forty per cent., and particularly when the drop should be due to the downward gyrations of a crashing market, the plaintiff wished for no one, other than himself in China, with power to act. The authority of the February 9th, 1923, letter was, by its terms, to continue during the plaintiff's absence in China. That absence, broken only by comparatively short furloughs, continued until after the incidents sued on. The trial court properly declined to eliminate the letter as a matter of law. The question was one for the jury.

The appellant's sixth and final point is that the court below erred in refusing to direct a verdict for the plaintiff on the second count. The argument hereon assumes the disposal of point three favorably to the plaintiff. With the letter of February 9th, 1923, properly in the hands of the jury, there was evidence to sustain a finding that in an emergency Burns was authorized to act as he thought best. That the events of October 29th and 30th, 1929, constituted a market emergency, and that Burns, exercising his authority, directed plaintiff's securities to be sold, were findings well within the province of the jury under the testimony. The second count grounds in the theory that defendant's firm, for its own purposes and uses, disposed of plaintiff's securities, without authority, and in so doing converted those securities. A finding by the jury that the sale was under the direction of plaintiff or of plaintiff's duly authorized agent would be—and is—a complete and final negation of that cause of action. The motion for direction was properly denied.

Judgment below will be affirmed.

*For affirmance*—THE CHIEF JUSTICE, TRENCHARD, PARKER, CAMPBELL, LLOYD, CASE, BODINE, DONGES, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, KERNEY, JJ. 14.

*For reversal*—None.